IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CALLPOD, INC., | ) | |
| | ) | |
| Plaintiff/Counter Defendant, | ) | Case No. 06 C 4961 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| GN NETCOM, INC., GN NETCOM, A/S, | ) | |
| and HELLO DIRECT, INC., | ) | |
| | ) | |
| Defendants/Counter Plaintiffs. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Callpod, Inc. ("Callpod") sued Defendants GN Netcom, Inc., GN Netcom, A/S and Hello Direct, Inc. (collectively "Defendants") for infringement of U.S. Patent No. 6,801,611 ("the '611 patent"), entitled "Call Pod for Having Conference Calls in a Portable Environment." The Court accepted briefs on the parties' proposed constructions of the claims in the '611 patent and held a technology demonstration. The Court's construction of the terms is set forth below.

## BACKGROUND

The '611 patent relates to methods and devices for making conference calls using cordless or mobile telephones. Previous technology required conference call participants to use the same speaker phone while in the same room. Using the '611 patent, Callpod markets a device that allows callers to participate in a conference call from various locations by using wireless signals to connect cordless or mobile phones to the same call. Callpod claims that Defendants manufacture and sell two products for making conference calls through cordless or mobile telephones that infringe the '611 patent.

## STANDARD OF REVIEW

1

Claim construction resolves disputed meanings in a patent to clarify and explain what the claims cover. *See Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005). The construction of the claims at issue is a legal determination to be made by the court. *See id.* (*citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995)). Generally, the terms of a claim are given the ordinary and customary meaning that the terms would have to a person of ordinary skill in the art at the time of the filing date of the patent application. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). When interpreting an asserted claim, the court looks first to intrinsic evidence: the words of the claims, the patent specification, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The claim language is the starting point for claim construction analysis because it frames and ultimately resolves all issues of claim interpretation. *See Robotic Vision Sys., Inc. v. View Eng'g Inc.*, 189 F.3d 1370, 1375 (Fed. Cir. 1997). In some cases, the "ordinary and customary" meaning of the claim language may be readily apparent, even to lay judges, and the court applies the widely accepted meaning of the commonly understood words. *See Phillips*, 415 F.3d at 1314. In such cases, a general purpose dictionary may be helpful. *See id.* In many cases, however, the court must proceed beyond the bare language of the claims and examine the patent specification. *See id.* at 1314-15. "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The specification is usually dispositive; "it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In the specification, the patentee provides a written description of the invention that allows a person of ordinary skill in the art to make and use

2

the invention. *See id.* at 1323. At times, the patentee uses the specification to "set forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

The court may also look to the patent's prosecution history. *See Phillips*, 415 F.3d at 1317. While the prosecution history often lacks the clarity of and is less useful than the specification, it may inform the court of the meaning of a claim term by illustrating how the inventor understood the invention as well as how the inventor may have limited the scope of the invention. *See id.* The prosecution history is generally relevant if a particular interpretation of the claim was considered and specifically disclaimed during the prosecution of the patent. *See Schumer v. Lab. Comp.* Sys., 308 F.3d 1304, 1313 (Fed. Cir. 2002).

Finally, a court may also consult "extrinsic evidence," such as dictionaries, treatises, and expert testimony, to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317-18. Generally, extrinsic evidence is "less reliable" than intrinsic evidence and is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. With respect to the use of dictionaries, technical or general, a court may consult such evidence "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23.

## DISCUSSION

The parties dispute the meaning of the following terms and phrases used in the '611 patent: (1) "plurality"; (2) "call pod"; (3) "operably connecting"; (4) "means for operably connecting a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod"; (5) "wireless telephone"; (6) "interconnecting"; (7) "means for forming a two-way voice path among

3

the plurality of headsets and the wireless telephone interface within the call pod"; (8) "means for muting a microphone of a call participant of the plurality of participants"; (9) "activates the call pod", automatically activate", and "automatically deactivate"; (10) "within the call pod"; (11) "sense circuit"; (12) "two-way voice path"; and (13) potential means-plus-function language in claims 1 through 7.

A. "Plurality"

The term "plurality" initially appears in the preamble to claim 1. Callpod argues that "plurality" means "more than one." Defendants, however, claim that the meaning of "plurality" depends upon the context. When the claims speak of a "plurality of participants," Defendants contend the phrase should be construed as "three or more participants." When the claims speak of a "plurality of headsets," Defendant contends the term should be construed as "more than one headset." For the following reasons, the Court adopts Callpod's construction of the term "plurality."

Both parties agree that "plurality," when used in conjunction with "headsets," means "at least two." "[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). Nonetheless, Defendants claim that the term "plurality," when used in conjunction with "conference call participants," suggests at least three participants based upon the ordinary and customary meaning of the term "conference call." However, by looking to the language of the claims, the conclusion that "plurality of headsets" means "at least two headsets" requires construing "plurality of participants" as meaning "at least two participants" because the former phrase modifies the latter: "a plurality of headsets *of the* plurality of conference call participants." (JA, Ex. 1, '611 Patent, at 3:63-64 (emphasis added).) The Defendants' argument

4

would result in the nonsensical situation of having only two headsets but requiring at least three remote participants to share them in a conference call. Thus, while the Court recognizes that a conference call ordinarily refers to three or more parties, the language of the claims carves out a subset of all callers when it refers to "plurality of participants" as only those participants who are using the call pod. Therefore, the Court construes the term "plurality" to mean "more than one."

B. "Call pod"

The term "call pod" initially appears in claim 1 of the '611 patent. Callpod contends that "call pod" should be construed to mean "a portable device which forms conference calls among a plurality of call participants." Defendants claim that "call pod" should be construed as "a portable device with a least two headset ports." Alternatively, Defendants recommend that "receptacles" or "plugs" be used in place of "ports" in its construction of the term as both are found within the patent description.

The claim language itself does little to resolve this issue. Each of the independent claims use the term "call pod" and states that the call pod is "for interconnecting a plurality of headsets." (JA, Ex. 1, '611 Patent, claims 1, 9, & 18). However, nothing in the claims specifically suggests that the headsets require ports to achieve the interconnection. Fortunately, while the claim language is inconclusive, the specification expressly defines "call pod" as a "portable telephone device which forms conference calls among a plurality of call participants, at least two of which are proximate the call pod." (JA, Ex. 1, '611 Patent, at 2:23-25.) Defendants claim that this definition does not satisfy the precision requirement in 35 U.S.C. §112 because Callpod's proposed definition could refer to any mobile telephone with a speaker function. However, the reference to headsets throughout the patent would resolve any such confusion and provide sufficient clarity and precision for a person

5

skilled in the art to know what the invention actually concerns. Moreover, even when a different meaning from what the specification provides could be attached to the term at issue, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. Therefore, the Court will construe "call pod" to mean "a portable device which forms conference calls among a plurality of call participants."

C. "Operably connecting"

The term "operably connecting" first appears in claim 1 of the '611 patent, and again in claim 9. Virtually identical language appears in claim 18, the third independent claim, where it states "operably connect." Callpod contends that term means "connecting in a manner that allows a signal to flow from one point to another point." Defendants propose that the term should be construed as "physically connecting."

The language of the claims themselves supports Callpod's position. Claim 18 has an added limitation not present in the two other independent claims: "a wireless telephone interconnect cable adapted to operably connect. . . ." (JA, Ex. 1, '611 Patent, col.5 ll.16-17.) The fact that the claim mentions a physical cable as a requirement to be adapted for the operable connection suggests that the previous claims that do not include the cable limitation are broader. *See Intamin Ltd. v. Magnetar Tech., Corp.*, 483 F.3d 1328, 1334-35 (Fed. Cir. 2007) (stating that where a later claim includes a limitation not present in an earlier claim, the earlier claim impliedly includes embodiments that do not include that limitation).

Defendants claim that the specification precludes such a broad reading of the claims for the specification refers solely to physical connections. Callpod argues that references in the specification concerning physical connections do not limit the scope of the patent but merely describe the preferred embodiment. The detailed description of the invention in the patent falls

under the heading, "Detailed Description of the Preferred Embodiment." (JA, Ex. 1, '611 Patent, at 1:60-61.) The description then proceeds to describe only "an illustrate embodiment" with connections that "may" be accomplished by an interconnecting cable. (JA, Ex. 1, '611 Patent, at 1:62-67.) When a patent details only the preferred embodiment, other embodiments are not necessarily disclaimed. *See Phillips*, 415 F.3d at 1323. Even though the '611 patent only details the preferred embodiment, other embodiments are not expressly disclaimed. Therefore, the Court does not construe the '611 as being limited to the preferred embodiment. Accordingly, Court construes "operably connecting" to mean "connecting in a manner that allows a signal to flow from one point to another point."

D. "Means for operably connecting a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod"

The phrase "means for operably connecting a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod" initially appears in claim 9 and the parties agree that the phrase is in a means-plus-function format governed by 35 U.S.C. §112 ¶6. Moreover, the parties agree that the function is to operably connect a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod. However, the parties dispute which structure is disclosed in the specification for performing the function. Callpod asserts that the structure is a cord, adaptor, or wireless connection, and equivalents thereof. Defendants contend that the structure is an interconnect cable with plugs to connect a wireless telephone headset input and the wireless telephone input of the call pod.

Defendants claim that the only structure disclosed in the patent is the preferred embodiment, which specifically includes an interconnect cable. However, the '611 patent's specifications state:

7

"The method includes the steps of . . . operably connecting a headset interface of a wireless telephone with *a wireless audio interface of the call pod* and forming a two-way voice path among the plurality of headsets and *the wireless interface within the call pod*." (JA, Ex. 1, '611 Patent, at 1:44-50 (emphasis added).) While this phrase uses the term "wireless," the language of the patent suggests that the term only refers to the mobile telephone connected to the call pod and not the nature of the connection between the mobile telephone and the call pod. Claim 18 contains almost the same language, except that it specifically mentions an interconnect cable, as described in the preferred embodiment, rather than the broader means-plus-function language in claim 9. Because a cable is specifically claimed in claim 18 as the means to connect the wireless telephone with the wireless telephone audio interface, the language of the '611 does not explicitly disclose a wireless connection. The only structure explicitly disclosed in the patent is the interconnect cable as described in the preferred embodiment. As such, the Court construes the structure for performing the function of the claim as an interconnect cable with plugs.

    E. "Wireless telephone"

Callpod makes no mention of a dispute concerning the term "wireless telephone," which initially appears in claim 1, in its opening brief. Nor does Callpod address the term in its reply brief even though Defendants addressed it and specifically stated that Callpod neglected to mention the issue in its opening brief.

According to the Joint Claim Construction Chart, the parties do not actually disagree as to the meaning of the term (which may be why Callpod never addressed it), but Defendants seek to add a limitation or clarification. The parties agree that "wireless telephone" means "a mobile phone or handset of a cordless phone." Defendants would have the term additionally construed to specifically

exclude a base station of a cordless phone. Because Callpod has not given any objection or counterargument to Defendants' limitation, this Court will construe "wireless telephone" as "a mobile phone or a handset of a cordless phone, but not a base station of a cordless phone." *See Halliburton Energy Svcs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 n.2 (Fed. Cir. 2008) (finding arguments not presented to be waived). Moreover, waiver aside, Defendants' clarification is consistent with the '611 patent's reference to a wireless phone, which would not include a base station of a cordless phone that necessarily is wired.

F. "Interconnecting"

The term "interconnecting" first appears in the following language of claim 1: "a call pod for interconnecting a plurality of headsets of the plurality of participants." (JA, Ex. 1, '611 Patent, at 3:63-64.) Callpod argues that the term means "connecting, which includes connecting physically, through the use of a cord, adaptor, or wireless connection." Defendants claim that the term means "physically connecting."

The specifications of the '611 patent provide an illustrative embodiment where the telephone "may be coupled to the call pod . . . by use of an interconnecting cable." (JA, Ex. 1, '611 Patent, at 1:62-2:2.) Therefore, the plain language of the patent shows that the patent does not necessarily require a physical connection because of the permissive nature of the phrase "may be coupled . . . by use of an interconnecting cable." The cable is one potential way of accomplishing the interconnection contemplated by the '611 patent, but it is not the exclusive way. In fact, the plain and ordinary meaning of "interconnect" in the telecommunications context only refers to "the linkage used to join two or more communications units," without reference to a physical connection. (JA, Ex. 4, Ex. 5) (industry definitions from the National Communications System Technolgoy &

9

Standards Division's Glossary of Telecommuniction Terms and the Telecom Glossary). Moreover, if the term "interconnecting" meant "physically connecting," the term "cable" would be either redundant or unnecessary in the text of the patent. Additionally, the patent expressly discloses a wireless method of interconnecting when it provides "the method includes the steps of providing a call pod for interconnecting a plurality of headsets of the plurality of participants, operably connecting a headset interface of a wireless telephone with a wireless audio interface of the call pod and forming a two-way voice path among the plurality of headsets and the wireless interface within the call pod." (JA, Ex. 1, '611 patent, at 1:44-50.) The plain language of the '611 patent does not limit the term "interconnecting" to a physical connection only. Therefore, the Court construes "interconnecting" to mean "connecting, which includes connecting physically, through the use of a cord, adaptor or wireless connection."

G. "Means for forming a two-way voice path"

While the parties agree on the function of this term, they disagree on what structure is disclosed in the specification for performing the function. Callpod contends that "means for forming a two-way voice path" discloses a call pod and equivalents thereof, while Defendants contend that it discloses Circuits 54 and 56 shown in Fig. 2A of the '611 patent.

The intrinsic evidence shows that the patent expressly discloses that the "method includes the steps of providing a call pod for interconnecting a plurality of headsets of the plurality of participants, operably connecting a heaset interface of a wireless telephone with a wireless telephone with a wireless audio interface of the *call pod and forming a two-way voice path among the plurality of headsets and the wireless interface within the call pod*." (JA, Ex. 1, '611 patent, at 1:44-51) (emphasis added).) The specifications elaborate that the "call pod . . . allows several persons on one

side of a conversation to listen to and speak" via two-way voice path. (JA, Ex. 1, '611 patent, at 2:8-19.) Although the '611 patent references Circuits 54 and 56 of Fig. 2A, nothing in the patent language limits the structure to the illustrations. (JA, Ex. 1, '611 patent, at 2:33-35 ("Under the illustrated embodiment, the call pod . . . relies upon four cicuits 50, 52, 54, 56 to facilitate conferencing functions.")) Rather, the language of the '611 patent discloses one illustration of a call pod without limiting the structure to only the figures disclosed in Circuits 54 and 56 of Fig. 2A. Therefore, the Court determines that "means for forming a two-way voice path among the plurality of headsets and the wireless telephone interface within the call pod" discloses the struture of a call pod.

H. "Means for muting a microphone of a call participant of the plurality of participants" and "Means for muting a headset of a participant of the plurality of participants"

Once again, the parties agree on the function of the phrases "means for muting a microphone of a call participant of the plurality of participants" and "means for muting a headset of a participant of the plurality of participants" while disagreeing on the disclosed structure. The parties agree that the terms each refer to a function that mutes a microphone of a call participant. Callpod claims that "means for muting a microphone of a call participant of the plurality of participants" discloses "a mute button on the microphone and equivalents" and that "means for muting a headset of a participant of the plurality of participants" discloses "a mute button on the heaset and equivalents." Defendants claim that in each phrase, the '611 patent discloses "a mute button on the call pod and equivalents." Essentially, the parties dispute whether the mute button must be on the call pod itself.

In describing the call pod itself, the '611 patent expressly discloses "a pushbutton adapted to mute a microphone of a call participant of the plurality of participants." (JA, Ex. 1, '611 patent,

11

at 6:14-18.) Additionally, the specifications disclose buttons on the call pod that serve to mute the microphone and the headset. (JA, Ex. 1, '611 patent, at 3:27-32 ("if a use of a headset (e.g., 14) should want to passively monitor the call, then the use may activate a MUTE button . . . . Activation of a MUTE button . . . functions to disconnect a local user microphone of headset . . . .")) Because the specifications of the '611 patent expressly disclose that the call pod has buttons that mute the microphone and the headset, the Court construes the phrases "means for muting a microphone of a call participant of the plurality of participants" and "means for muting a headset of a participant of the plurality of participants" to mean "a mute button on a call pod."

I. "Activates the call pod", "automatically activate", and "automatically deactivate"

The parties dispute the meaning of these three terms because they disagree over the meaning of the term "activate" in the '611 patent. Callpod claims that "activation" refers to operating the call pod to connect a call, while Defendants contend that "activation" refers to powering the call pod on.

The '611 patent expressly discloses "a power switch adapted to automatically activate the call pod upon detection of a call connection." (JA, Ex. 1, '611 patent, at 6:7-11.) The specifications provide another way for the call pod to receive power: a microphone bias current. (JA, Ex. 1, '611 patent, at 2:44-51.) When the call pod uses the microphone bias current, "the bias current provided by the wireless telephone may be used to activate the call pod during a call, *thereby eliminating the need for a power switch . . . .*" (JA, Ex. 1, '611 patent, at 2:44-49.) Therefore, the term "activate" refers to turning the call pod on through the use of a power switch or microphone bias current. Regardless of how the call pod receives power, when the '611 patent describes activation of the call pod, it refers to turning the call pod on, not connecting a call. Accordingly, the Court determines that "activate" means "to power the call pod on."

12

Based upon that construction, the Court determines that "actives the call pod" means "powers on the call pod." Likewise, "automatically activate" means "to automatically power on the call pod during a call." Finally, "automatically deactivate" means "to automatically power off the call pod upon the termination of the call."

J. "Within the call pod"

Defendants claim that "within the call pod" means "the structures for forming the voice path are inside the call pod." Callpod claims that construction of the term "within the call pod" is not necessary because it is clear and unambiguous.

Defendants offer their interpretation to clarify that "[t]he phrase 'within the call pod' cannot refer to the headsets, because they are outside the call pod and connected to it." However, the phrase "within the call pod" does not need further clarification. *See U.S. Surgical Corp v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy."). The headsets and everything else that are outside of the call pod are already necessarily excluded by the phrase "within the call pod." Further construction of the term would only introduce confusion and ambiguity into a clear and unambiguous phrase. Therefore, the Court finds that the term "within the call pod" does not require further construction.

K. "Sense circuit"

Callpod claims that "sense circuit" means "a circuit that detects a flow of current." Defendants claim that "sense circuit" does not require further construction because the '611 provides a clear and unambiguous definition for the term.

In claim 1 of the '611 patent, a sense circuit "detects a microphone bias current on a microphone input of the wireless telephone and activates the call pod using the detected microphone

13

bias current." (JA, Ex. 1, '611 patent, at 4:3-9.) The patent is clear and unambiguous that the sense circuit uses a microphone bias current to power on the call pod once it detects such a current. Adopting Callpod's proposed construction of "sense circuit" could have the effect of broadening an express limitation in the patent because the proposed construction includes all "flows of current" instead of only microphone bias currents. Because the express language of the '611 patent defines a "sense circuit," the term "sense circuit" does not require further construction.

L. "Two-way voice path"

Callpod claims that the term "two-way voice path" means "voice communication occurring in either of two directions," while Defendants claim that construction of the term is unnecessary.

Callpod's proposed definition refers to the voice communication itself, rather than the route traveled by the communication. Therefore, Callpod's proposed definition reads the term "path" out of the term "two-way voice path." Although Defendants claim that construction of the term is unnecessary, they agree that a two-way transmission means a transmission that has the potential to occur in two directions simultaneously. The plain language of the '611 patent describes a route for voice communications and the parties agree that the communications may travel in two directions simultaneously. Because the plain language of the '611 patent adequately describes a route that would enable voice communications to travel in two directions simultaneously, the Court determines that further construction of the term "two-way voice path" is not necessary.

M. Potential step-plus-function language in claims 1-7

The parties dispute whether the language in claims 1-7 invoke 35 U.S.C. § 112 ¶ 6, which allows for means-plus-function and step-plus-function claiming. Specifically, the statute provides that an "element in a claim for a combination may be expressed as a means or a step for performing a specified function without the recital of structure, material, or acts in support thereof. . . ." 35 U.S.C. § 112, ¶ 6. The Federal Circuit has explained that the term "step" applies for process claims and that the term "acts" refer to the implementation of the steps, whereas the term "means" corresponds to apparatus claims implemented by structures or materials. *See O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1582-83 (Fed. Cir. 1997). Claims 1-7 are method claims, and, therefore, involve steps implemented by acts.

For a court to determine that an element is a step-plus-function, in addition to the step itself, the patent must claim a function without the mention of any acts. *See id.* at 1583. Moreover, unless the words "steps for" appear in the claim, there is a presumption that § 112 ¶ 6 does not apply, but the presumption may be rebutted if the claim clearly defines a function rather than an act. *See Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371-72 (Fed. Cir. 2003); *Seal-Flex, Inc. v. Athletic Track & Court Construction*, 172 F.3d 836, 848-49 (Fed. Cir. 1999) (Rader, J., concurring).

Callpod points to nine different phrases within claims 1-7 where the parties dispute whether § 112 ¶ 6 applies. Because none of the claims use the phrase "steps for," the presumption is that none of the claims are step-plus-functions. Moreover, the phrase in the preamble stating "such method comprising the steps of" is insufficient to convert the claim into a step-plus-function claim. *See Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 381 F.3d 1371, 1381 (Fed. Cir. 2004).

Therefore, Defendants have the burden of rebutting the presumption against application of § 112 ¶ 6.

The first phrase at issue is the first clause in the body of claim 1, which reads: "providing a call pod for interconnecting a plurality of headsets of the plurality of participants." (JA, Ex. 1, '611 Patent, at 3:63-64.) Defendants contend that "providing a call pod" refers to the underlying function of the entire invention, rather than a particular act to accomplish this function. Although the call pod ultimately accomplishes the purpose of the invention, the phrase "providing a call pod" is an act rather than a function. For the invention to operate, the call pod must be present. Because the call pod is an essential element of the '611 patent, the reference to the call pod does not operate to establish a function. This reference to the call pod also serves to properly introduce the call pod for reference throughout the rest of the claim; it does not operate to establish a function. Defendants do not point to any other language within the '611 patent that would establish that "providing a call pod" is a function. Therefore, Defendants have failed to rebut the presumption that § 112 ¶ 6 does not apply.

With respect to the other disputed elements of claims 1-7, Defendants do not address the other eight phrases that they contend are step-plus-functions. Therefore, Defendants have failed to meet their burden to rebut the presumption against § 112 ¶ 6. Accordingly, § 112 ¶ 6 does not apply to any of the elements in claims 1-7.

## CONCLUSION AND ORDER

For the reasons stated, the Court construes the disputed terms as stated above.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: March 6, 2009