IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CALLPOD, INC., ) | |
| ) | |
| Plaintiff, ) | Case No. 06 C 4961 |
| v. ) | |
| ) | Judge Virginia M. Kendall |
| GN NETCOM, INC., GN NETCOM, A/S, GN ) | |
| STORE NORD, A/S, and HELLO DIRECT, ) | |
| INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Callpod, Inc. ("Callpod") filed suit against Defendants GN Netcom, Inc., GN

Netcom A/S, and Hello Direct, Inc. (collectively "Defendants") alleging direct and indirect

infringement of United States Patent No. 6,801,611 ("the '611 patent"). Defendants counterclaimed

seeking a declaratory judgment of invalidity of the '611 patent, and now move for summary

judgment on non-infringement and invalidity of the patent. For the reasons set forth below,

Defendants' Motion for Summary Judgment of Noninfringement of The '611 Patent is granted.

Defendants' Motion for Summary Judgment of Invalidity of The '611 Patent is denied.

In connection with the Motions for Summary Judgment, Defendants moved to exclude

certain expert testimony and the parties filed a total of five motions to strike various reports and

exhibits filed by the opposing side. On October 27, 2009, the Court denied Callpod's Motion to

Strike Defendants' Reply to Callpod's Response to Defendants' Statement of Undisputed Material

Facts, Defendants' Cross-Motion to Strike Portions of Callpod's Responsive Fact Statements and

Accompanying Exhibits, and Defendants' Motion to Strike Portions of the Deposition Errata Sheet

of Callpod's Expert Witness Paul Bierbauer for the reasons stated in open court. The Court

addresses the remaining substantive motions in this Order. As explained below, Defendants' Motion to Exclude Opinions of Callpod's Proposed Expert Witnesses is granted in part and denied in part. Callpod's Motion to Strike the August 7, 2009 Supplemental Report of James L. Lansford is granted in part and denied in part. Callpod's Motion to Strike the Affidavit of Ilka Müller and Accompanying Exhibits is denied.

## MOTIONS TO STRIKE

### I. Defendants' Motion to Exclude Opinions of Callpod's Proposed Expert Witnesses

#### A. Defendants' Motion to Exclude Opinions of Callpod's Technical Expert, Paul Bierbauer

Paul D. Bierbauer ("Bierbauer") is a senior professor of electronics technology at Devry University who opines that the Defendants' allegedly infringing products (the "accused products") contain each and every element of at least some of the asserted claims of the '611 patent; that GN's sales of certain products meet the standard for contributory infringement; that no design alternatives are available to GN that provide the features and benefits currently offered by the accused products; and that Callpod's *Phoenix* product practices the claims of the '611 patent. Defendants challenge Bierbauer's opinions regarding the definitions of when a device powers-on and microphone bias current on methodology and relevance grounds, and challenge as unsupported his opinions about contributory infringement, the availability of design alternatives, and Callpod's *Phoenix* product.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of an opinion or otherwise." A three-step admissibility analysis applies to expert testimony under Rule 702 and *Daubert*. *See Ervin*, 492 F.3d at 904. First, "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education.'" *Id.* (quoting Fed.R.Evid. 702). Second, "the expert's reasoning or methodology underlying the testimony must be scientifically reliable." *Id.* (citing *Daubert*, 509 U.S. at 592-93). Finally, the expert's testimony must be relevant, or "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin*, 492 F.3d at 904.

Defendants do not squarely challenge Bierbauer's qualifications to testify as an expert in the field of communications engineering. Bierbauer's Curriculum Vitae, attached as an exhibit to his report, reflects that he is a senior professor in the Electronic Technician department of DeVry University, and that he is currently writing a series of textbooks in the communications engineering field. (*See* R. 263, Ex. A, Expert Report of Paul D. Bierbauer Regarding Infringement of U.S. Patent No. 6,801,611, at 210-11.) (hereinafter "Bierbauer Rep.") Accordingly, the Court finds him qualified to provide expert testimony on the subjects in his report. *See Reilly v. Blue Cross & Blue Shield United of Wisc.*, 846 F.2d 416, 421 (7th Cir. 1988) (reviewing experts' curricula vitae in order to support an uncontested finding that the experts were qualified in their fields).

### 1. Microphone Bias Current

Bierbauer's report opines that the accused products have a sense circuit that detects microphone bias current, defined in his report as a type of bias current that falls into audio levels. (*See* Bierbauer Rep. at 35-36.) During his deposition, he further testified that bias current and microphone bias current are not the same, and that microphone bias current is a specifically audio

signal.  (*See* R. 263, Ex. D, Deposition Testimony of Paul D. Bierbauer, at 184.) (hereinafter "Bierbauer Dep.")  Defendants challenge this opinion as not based upon a proper methodology.

Bierbauer testified that he had never "seen the term microphone bias current used until the study of this case." (Bierbauer Dep. at 191.)  However, Bierbauer did not conduct any kind of methodic inquiry into whether the term had an established meaning in the relevant art.  Without more, Bierbauer's statement that the phrase microphone bias current as used in the '611 patent is novel or unique within the field constitutes a conclusion based solely on his expert intuition which is not an appropriate foundation for expert testimony.  *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).  Bierbauer thus failed to appropriately consider "the ordinary meaning that would be attributed to" the phrase microphone bias current, taken in its entirety, "by persons skilled in the relevant art." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 874-75 (Fed. Cir. 2001).

Because of his inadequately supported determination that microphone bias current was not a widely used term within the field, Bierbauer attempted to define the term by reference to technical dictionaries and the testimony of other witnesses, who had defined the terms "bias" and "bias current," and to extrapolate from those definitions.  (*See* Bierbauer Rep. at 35-36.)  Even though his methodology in determining the meaning of the terms bias and bias current alone was appropriate, this research does not adequately support his proposed expert opinion as to the meaning of the larger, and more relevant term, microphone bias current.

More importantly, however, Bierbauer's proposed testimony would be irrelevant at trial because the construction of the claims of a patent is a legal determination to be made by the Court, and not an issue of fact for the jury. *See Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir.

2005).  Here, Bierbauer's testimony is little more than an attempt to define for the jury the appropriate construction of a claim in the '611 patent.  During claim construction on this case, the Court declined to further construe the term "sense circuit" as used in the '611 patent, because the "patent is clear and unambiguous that the sense circuit uses a microphone bias current to power on the call pod once it detects such a current." (R. 244, Mem. Op. & Order, at 13-14.)  The parties did not dispute the meaning of the term "microphone bias current" during claim construction, but Callpod attempts to raise the issue now through Bierbauer's proposed testimony as to the meaning of the term.  When experts opine as to claim construction issues, the risk of jury confusion is high, and allowance of such testimony is improper.  *See CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005).  Bierbauer's testimony as to the meaning of the term microphone bias current is therefore not admissible, and Defendants' Motion is granted as to this opinion.

## 2.  *The Definition of "Power On"*

During claim construction, the Court determined that the term "activate," as used in the '611 patent, "refers to turning the call pod on through the use of a power switch or microphone bias current." (R. 244, Mem. Op. & Order, at 12.)  The Court accordingly construed activate as meaning "to power the call pod on." (*Id.*)  Bierbauer now opines that the accused products "power on" when they receive an audio signal.  (*See* Bierbauer Rep. at 52, 55.)  Defendants challenge this opinion as contradictory to, and irrelevant in light of, the Court's prior construction of activate.

The parties disputed the claim construction of the term activate as used in the asserted claims, with Callpod asserting that activation refers to operating the call pod to connect a call, and Defendants arguing that activation refers to powering on the call pod.  (R. 244 at 12.)  Bierbauer's opinion that the call pod does not power on until it receives an audio signal would mean that the call

pod is not activated—does not power on—until it receives an audio signal, that is, until a call is connected. This is precisely the construction of activate that the Court considered, and rejected, in its claim construction. Expert opinions that conflict with a court's established claim construction tend only to create confusion and are thus unhelpful to the jury. *See CytoLogix*, 424 F.3d at 1172. Bierbauer's testimony as to the meaning of "power on" is therefore barred as irrelevant. Defendants' Motion is therefore granted as to this opinion.

### 3. Contributory Infringement

Bierbauer's report opines that the accused products "meet the standard for contributory infringement." Callpod's Response Brief, however, indicates that it does not intend to offer Bierbauer's opinion on this subject at trial. Accordingly, Defendants' Motion is dismissed as moot with respect to this opinion.

### 4. Design Alternatives

Bierbauer opines that no design alternatives are available to Defendants that provide the features and benefits currently offered by the accused products. Defendants challenge this opinion as unacceptable because Bierbauer allegedly did not consider any possible design alternatives or examine whether any specific alternative would be acceptable. However, Defendants do not point to the existence of any such hypothetical, but unexamined alternatives, and Defendants concede that they have made no specific attempts to design around the claims of the '611 patent.

Bierbauer's opinion on design alternatives is relevant because the calculation of lost profit damages due to infringement of a patent considers "available alternatives—including but not limited to products on the market" in determining what the patent-holder would have made if not for the infringement. *See Grain Processing Corp. v. American Maize-Prods. Corp.*, 185 F.3d 1341, 1350

(Fed. Cir. 1999). This calculation requires reference only to known alternatives, however. Defendants have pointed to no authority arising from the patent-law context supporting the argument that an expert must consider hypothetically possible alternatives that are neither available nor on the market before he may opine that there are no non-infringing alternatives. Defendants' argument would base the damages calculation not on whether there are known non-infringing alternatives, as mandated by the requirement that patentees seeking damages provide "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture," *see id.*, but on whether there are any possible non-infringing alternatives, for which there is no precedent in the law.

Because Bierbauer's opinion that Defendants have not developed any alternatives to the Accused Products and that no such alternatives are currently available is sufficiently founded in his review of the facts of the case and relevant under the law of damages, Defendant's Motion to bar this opinion is denied.i

### 5. *The Phoenix Product*

Bierbauer's report opines that Callpod's *Phoenix* product practices the claims of the '611 patent. Callpod's Response Brief, however, indicates that Callpod does not intend to offer Bierbauer's opinion on this subject at trial. Accordingly, Defendants' Motion is dismissed as moot with respect to this opinion.

### B. Defendants' Motion to Exclude Opinions of Callpod's Damages Expert, James Malackowski

James Malackowski, Callpod's damages expert, opines that an appropriate royalty should Defendants be found to infringe the '611 patent "falls within the range of $15.00 - $20.00 per accused product sold." (R. 263, Ex. C, Expert Report of James E. Malackowski, at 5.) (hereinafter

"Malackowski Rep.") Defendants move to bar this opinion due to Malackowski's reliance on Bierbauer's opinion regarding the lack of available design alternatives, but do not otherwise challenge Malackowski's qualifications, methodology, or the relevance of his damages testimony. Therefore, the Court need not consider whether he is qualified to offer his proposed opinions or whether he reached his damages conclusion via an appropriate methodology in general. *See United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008) ("A judge is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists."). His testimony is relevant to the issue of Callpod's damages should a jury ultimately find that Defendants infringed the '611 patent.

As described above, Bierbauer's opinion regarding the lack of available non-infringing alternatives is admissible, and Malackowski's opinion will not therefore be barred for relying upon Bierbauer's opinion. Even if Bierbauer's statement about design alternatives were not admissible, however, Malackowski's reliance upon that opinion in one section of his sixty-one page report would not require that the entirety of the report be barred. He considered several methods for determining a reasonable royalty that did not depend on, or even refer to, the existence of an alternative design, such as the market approach, which considered the licensing history of the patent, the accused products, and other similar products in the market. (*See* Malackowski Rep. at 30-32.) Only in his discussion of the cost-based approach for determining a reasonable royalty does Malackowski depend upon Bierbauer's opinion that no non-infringing alternatives are available. (*See* Malackowski Rep. at 37-38.) Thus, even if Bierbauer's opinion were inadmissible, Defendants have not adequately shown that Malackowski's entire conclusion as to Callpod's damages is rendered unreliable by its reliance in only one respect upon Bierbauer's opinion.

Defendants' Motion to Exclude expert testimony is therefore granted in part and denied in part as to Callpod's technical expert, Paul Bierbauer, and denied as to Callpod's damages expert, James Malackowski.

## II. Callpod's Motion to Strike the August 7, 2009 Supplemental Expert Report of James L. Lansford

Callpod has moved to strike the supplemental expert report of Defendants' expert James L. Lansford ("Lansford"). For the reasons set forth below, Callpod's Motion to Strike is granted in part and denied in part.

Supplemental expert reports are permitted if they are based upon information discovered after the initial disclosure or upon the realization that the original disclosure was incorrect or incomplete. *See Talbert v. City of Chicago*, 236 F.R.D. 415, 422 (N.D. Ill. 2006). Rule 37(c)(1) provides that evidence not timely disclosed, in violation of Rule 26(a), may not be used at trial unless the violation is either justified or harmless. *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996). Four factors are helpful to this analysis: (1) the degree of surprise or prejudice to the non-offending party, (2) the capability of the offender to cure any prejudice, (3) the amount of disruption at trial that would result from the use of the evidence, and (4) the bad faith involved in not producing the evidence earlier. *See Bronk v. Ineichen*, 54 F.3d 425, 432 (7th Cir. 1995). In this case, though Lansford's supplemental report is untimely, it is both justified and harmless. However, portions of the supplemental expert report are not proper supplements under the Rule and will be stricken.

Lansford's supplemental expert report addresses four points: (1) Callpod's expert Bierbauer's deposition testimony regarding the definition of "microphone bias current," (2) Bierbauer's contradictory testimony regarding the meaning of "powering on," (3) Bierbauer's

"portable" definition, and (4) the commercial success of the *Phoenix* product offered by Callpod, following a change in position regarding the Phoenix product by Callpod and its experts.[1] Whether these topics can be addressed in a supplemental expert report is governed by Rule 26(e)(1), which states in pertinent part that parties have a duty to supplement discovery disclosures upon learning that previous disclosures were incomplete or incorrect. Fed. R. Civ. P. 26(e)(1).

Initial expert reports were due on June 8, 2009 with rebuttal reports due on July 10, 2009. Expert discovery in this case was set to close on July 31, 2009, but the depositions of Bierbauer and Lansford were set for July 27, 2009 and July 31, 2009, respectively. At Bierbauer's deposition he varied the underlying definitions of "microphone bias current" and "powering on" from those upon which he relied in his original report, and upon which Lansford relied in his rebuttal report. This late change of position rendered portions of Lansford's report incomplete, thus requiring him to supplement his expert report to address these changes. This supplement was finished within the week following Lansford's own deposition and within four days of his receipt of the expedited transcript of Bierbauer's deposition. The Court accordingly finds those portions of the supplemental report that address changes in Bierbauer's testimony to be both justified and harmless. There is no evidence that Callpod will be seriously prejudiced by the allowance of this supplemental report, or that Defendants acted in bad faith rather than with expedience following the changed circumstances which necessitated the supplement.

Lansford's section addressing the commercial success of the Phoenix device is proper for the same reasons, because Callpod's changed in the manner upon which it intended to rely upon the

---

[1] While Callpod contends that the prior art relied upon in Lansford's supplemental expert report is newly disclosed, each of the four patents at issue were either relied upon by Callpod's own expert, produced by Defendants during fact discovery, or disclosed during supplemental prior art discovery, all of which occurred prior to the date of Lansford's deposition.

Phoenix device in this litigation after Lansford's initial report, rendering Lansford's original opinion incomplete. However, Lansford's supplemental expert report on the definition of "portable" is merely further rebuttal of Bierbauer's unchanged definition of the same term, which did not need to be readdressed. It is therefore not a proper subject for a supplemental report, because Lansford's original opinion was neither incomplete nor incorrect, and is stricken.

For the foregoing reasons, Plaintiff's Motion to Strike the August 7, 2009 Supplemental Expert Report of James L. Lansford is Granted in Part and Denied in Part.

### III. Callpod's Motion to Strike the Affidavit of Ilka Müller and Accompanying Exhibits

Callpod moves to strike the Affidavit of Defendants' witness Ilka Müller and its accompanying exhibits on the grounds that the information contained within the affidavit and exhibits was not disclosed during either fact or expert discovery. For the reasons set forth below, the Motion to Strike is denied.

Rule 26 of the Federal Rules of Civil Procedure requires a party to provide the other party with "the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses . . . identifying the subjects of the information." Fed. R. Civ. P. (a)(1)(A). Rule 26 also requires a party to supplement or amend its disclosures if it learns that the information disclosed is "incomplete or incorrect and if the additional corrective information has not *otherwise been made known to the other parties* during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). To ensure compliance, Rule 37 automatically excludes the evidence unless the sanctioned party shows its violation of Rule 26(a) is either justified or harmless. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Defendants disclosed Ilka Müller as a person with knowledge relevant to this case by February 5, 2008. By February 14, 2008, Callpod had prepared a letter rogatory seeking evidence from RTX and Ilka Müller. Callpod was also made aware of the Ellipse product and of Ilka Müller's identity through the deposition of Hans Christian Nielsen and Defendants' supplementary interrogatory responses. Callpod received numerous documents from RTX and had prepared to take depositions in Denmark but cancelled a week prior to doing so. Thus, it is apparent that Callpod knew Ilka Müller was a person with discoverable information, knew about the Ellipse product that is the focus of Müller's affidavit, made a conscious decision not to pursue this information, and now seeks to bar Müller's testimony. Callpod cannot now claim to be surprised by Defendants' use of Ilka Müller's knowledge and affidavit, because its conscious decision to forego deposing Ilka Müller cannot be taxable to Defendants. *See Gutierrez v. AT&T Broadbard, LLC*, 382 F.3d 725, 733 (7th Cir. 2004) (plaintiff's tactical decisions not to pursue additional witnesses did not require that the affidavits of known, but non-deposed, witnesses be stricken). Furthermore, Defendants have promptly disclosed the additional documents relied upon in Ilka Müller's Affidavit once they became known to Defendants as opposed to merely known to third parties. *See Hobley v. Burge*, 433 F.3d 946, 950 (7th Cir. 2006) (stating that document requests are limited to documents in control of the party and not non-parties). Because Müller's identity and relevant knowledge were timely disclosed, Callpod's Motion to Strike the Affidavit of Ilka Müller is denied.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment.  An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## <u>STATEMENT OF UNDISPUTED FACTS</u>[2]

### I. The Parties

Callpod, a designer of mobile accessory products, is the owner and assignee of the '611 patent.[3]  (Pl. 56.1 Inv. Resp. ¶ 1.)  GN Netcom A/S is a Denmark corporation that develops, manufactures, and sells headset products.  (Pl. 56.1 Inv. Resp. ¶ 2.)  GN Netcom, Inc., a Delaware corporation, distributes GN Netcom A/S products in the United States.  (*Id.*)  Hello Direct, Inc., a Delaware Corporation, is a reseller of GN Netcom A/S products.  (*Id.*)  In June 2000, Darren Guccione ("Guccione"), one of the '611 patent's inventors and Callpod's President, CEO and Co-Founder, had the idea to "develop a mobile conferencing system that would allow people to

---

[2]  The Court notes that the parties have failed to comply with Local Rule 56.1, which allows parties to file a statement of undisputed material facts consisting of "short numbered paragraphs."  L.R. 56.1.  Ignoring that obligation, both sides here have filed statements of undisputed facts containing numerous lengthy paragraphs.  Furthermore, both sides have admitted or denied certain statements, but then improperly included additional facts and arguments in their response paragraphs.  Nonconformity with the Local Rules and the standing orders of the Court is not without consequence.  The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1."  *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)).  "A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56. 1, the court chooses to ignore and not consider the additional facts that a litigant has proposed."  *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).  Accordingly, the Court strikes any additional facts or arguments improperly included in the parties' response paragraphs.

[3] Throughout this Opinion, citations to Callpod's Response to Defendants' Statement of Facts in Support of Motion for Summary Judgment, or In the Alternative, Partial Summary Judgment, of Invalidity of the Claims of the '611 Patent have been abbreviated to "Pl. 56.1 Inv. Resp. ¶ __." ; citations to Defendants' Reply to Callpod's Response to Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment, of Invalidity of the Claims of the '611 Patent and Statement of Additional Facts have been abbreviated to "Def. 56.1 Inv. Reply ¶ __."; citations to Callpod's Response to Defendants' Statement of Facts in Support of Motion for Summary Judgment, or In the Alternative, Partial Summary Judgment, of Non-Infringement of the Claims of the '611 Patent have been abbreviated to "Pl. 56.1 Non-Inf. Resp. ¶ __."; and citations to Defendants' Reply to Callpod's Response to Defendants' Statement of Facts in Support of Motion for Summary Judgment, or In the Alternative, Partial Summary Judgment, of Non-Infringement of the Claims of the '611 Patent have been abbreviated to "Def. 56.1 Non-Inf. Reply ¶ ___."

conduct conference calls on the fly." (Pl. 56.1 Inv. Resp. ¶ 5.)[4]  Guccione incorporated Callpod in

2001.  (Pl. 56.1 Inv. Resp. ¶ 7.)

## II.  The Patent Application and Examination

Guccione and his co-inventor, Daniel Lurey ("Lurey") filed a patent application on June 29,

2001, which eventually issued as U.S. Patent No. 6,801,611 on October 5, 2004.  (Pl. 56.1 Inv. Resp.

¶ 14.)  The issued patent is titled "Call pod for having  calls in a portable environment."  (Pl. 56.1

Non-Inf. Resp. ¶ 5.)  The conception date, and therefore the priority date, for the patent is June 30,

2000.  (Pl. 56.1 Non-Inf. Resp. ¶ 6; Pl. 56.1 Inv. Resp. ¶ 40.)  Callpod attempted to license the '611

patent from 2000 to 2006; however, Callpod failed to conclude a single license of the '611 patent.

(Pl. 56.1 Inv. Resp. ¶ 67.)  Guccione testified for Callpod that Callpod offers the Callpod *Phoenix*

as a commercial product that embodies the technology of the '611 patent.  (Pl. 56.1 Non-Inf. Resp.

¶ 23.)

The claims of the initial patent application were as follows:

Claim 1:	A method of providing a conference call connection among a plurality
of conference call participants, such method comprising the steps of:
providing a call pod for interconnecting a plurality of headsets of the plurality of
participants;
operably connecting a headset interface of a wireless telephone with a wireless
telephone audio interface of the call pod; and
forming a two-way voice path among the plurality of headsets and the wireless
telephone interface within the call pod.

---

[4] In response to this and every subsequent statement of fact established, in whole or in part, by reference to the
Invalidity Report of Defendants' technical expert James L. Lansford, Callpod objected to the use of the report because
it was unauthenticated.  It is true that evidence relied upon to establish facts for summary judgment purposes must be
of a type admissible at trial, including "properly authenticated and admissible documents or exhibits."  *Smith v. City of
Chicago*, 242 F.3d 737, 741 (7th Cir. 2001).  Defendants have attempted to cure this flaw by submitting an authenticating
affidavit from Lansford as an exhibit to their reply to Callpod's response to their statements of fact.  The Court need not
decide if this is sufficient, however, because Defendants do not rely upon Lansford's report alone to create any genuine
issue of fact.  Instead, citations to Lansford's report are almost always contained within string citations that also refer
to admissible evidence supporting the same proposition.  Where Defendants have cited only to the Lansford report,
Callpod has either admitted the substance of the cited statement, or the fact substantiated by the Report is not genuinely
material to the Court's resolution of either of the pending summary judgment motions.

Claim 11:    An apparatus for providing a conference call connection among a plurality of conference call participants, such apparatus comprising:
a call pod for interconnecting a plurality of headsets of the plurality of participants;
means for operably connecting a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod; and
means for forming a two-way voice path among the plurality of headsets and the wireless telephone interface within the call pod.

Claim 22:    An apparatus for providing a conference call connection among a plurality of conference call participants, such apparatus comprising:
a call pod for interconnecting a plurality of headsets of the plurality of participants;
a wireless telephone interconnect cable adapted to operably connect a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod; and
first and second circuits adapted to form a two-way voice path among the plurality of headsets and the wireless telephone interface within the call pod.

(Pl. 56.1 Inv. Resp. ¶ 15.)  In an Office Action dated November 10, 2003, the patent examiner rejected these claims on the basis of obviousness because of the combination of Lucey, European Patent Application No. 0,187,696 ("Lucey"), and Diethorn, U.S. Patent No. 6,321,080 ("Diethorn"). (Pl. 56.1 Inv. Resp. ¶ 16.)  The patent examiner also rejected, on obviousness grounds, claims related to the detection of a bias current in light of Pehrsson, U.S. Patent No. 6,615,059 ("Pehrsson").  (Pl. 56.1 Inv. Resp. ¶ 17.)

Lucey, Diethorn, and Pehrsson are prior art to the '611 patent.  (Pl. 56.1 Inv. Resp. ¶¶ 20, 23.) Lucey discloses a plurality of headsets connected to a conferencing unit that is connected to a standard telephone system with full duplex capability.  (Pl. 56.1 Inv. Resp. ¶ 18.)  Lucey also discloses a flasher circuit and a muting capability.  (Pl. 56.1 Inv. Resp. ¶ 19.)  Diethorn discloses a conferencing telephone with a base having a handset that is connected to the base through a cordless connection.  (Pl. 56.1 Inv. Resp. ¶ 21.)  Diethorn also discloses that a connection between handset and conferencing base station can be made with a connecting cord.  (Pl. 56.1 Inv. Resp. ¶

22.) Pehrsson discloses the detection of a bias current from a microphone connection of the headset interface of a wireless telephone.  (Pl. 56.1 Inv. Resp. ¶ 17.)

Subsequent to the office action, Olisa Anwah ("Anwah"), the patent examiner, corresponded with Guccione about suggestions to amend claims 1, 11, and 22 with language from dependent claims 2 and 4.  (Pl. 56.1 Inv. Resp. ¶ 25.)  Specifically, she suggested cancelling claims 2 and 4 and amending claims 1, 11, and 22 with the addition of the following language:

> Wherein the call pod includes a sense circuit structured to automatically activate the call pod during a call and to automatically deactivate the call pod upon termination of the call wherein the sense circuit detects a microphone bias current on a microphone input of the wireless telephone and activates the call[]pod using the detected microphone bias current.

(*Id.*)  Following this e-mail, an amended application was filed amending claims 1, 11, and 22 with the language suggested by Anwah, and renumbering certain claims.  (Pl. 56.1 Inv. Resp. ¶¶ 26, 29.) The amendment dropped original claims 2 and 4.  (Pl. 56.1 Inv. Resp. ¶ 25.)  Other than by amending the claims, no challenge or dispute was made to the office's conclusion that the prior art rendered the claims of the original application obvious.  (Pl. 56.1 Inv. Resp. ¶ 24.)

The patent issued on May 3, 2004 with a notice of allowance stating that Pehrsson did not teach, disclose, or suggest that the sense circuit activates the call pod using the detected microphone bias.  (Pl. 56.1 Inv. Resp. ¶ 27.)  The independent issued claims 1, 9, and 18, formerly 1, 11, and 22, were materially the same as those listed above with the additional language added to the end of each claim.   (Pl. 56.1 Inv. Resp. ¶ 28.)  Dependent claims 11 and 20 issued to include the further limitation of a flasher circuit to independent claims 9 and 18.  (Pl. 56.1 Inv. Resp. ¶ 29.) Dependent claim 10 issued with the further limitation of means for activating the call pod upon detecting of a

call connection.  (Pl. 56.1 Inv. Resp. ¶ 32.)  Dependent claim 12 issued with the further limitation of means for deactivating the call pod upon termination of a call connection.  (*Id.*)

### III.  Prior Art Not Considered by the Patent Examiner

Defendants cite to Adachi, Japanese Patent No. JP8223305, as prior art that was not considered by the examiner during the prosecution of the '611 patent.  (Pl. 56.1 Inv. Resp. ¶ 62.) Adachi discloses a conferencing parent device that is wirelessly connected to a plurality of daughter devices with headsets for each participant.  (*Id.*)  The patent also discloses a two-way connection between the parent device and the daughter devices.  (Pl. 56.1 Inv. Resp. ¶ 58.)  However, Callpod's expert, Bierbauer, has opined that Lucey, Diethorn, and Adachi teach away from using an accessory with conferencing capability in favor of building it into a base station or handset.  (Def. 56.1 Inv. Reply ¶ 17.)

Defendants also cite to Hall, U.S. Patent No. 5,787,180, as prior art that was not considered by the examiner during the prosecution of the '611 patent.  (Pl. 56.1 Inv. Resp. ¶ 64.)  Hall discloses a scrambler or encryption device that can be attached to a cellular phone.  (Pl. 56.1 Inv. Resp. ¶ 63; Def. 56.1 Inv. Reply ¶ 32.)  The patent also discloses a microphone bias sensor element.  (*Id.*)

Defendants further cite Jacobson, U.S. Patent No. 4,160,122, as prior art that was not considered by the examiner during the prosecution of the '611 patent.  (Pl. 56.1 Inv. Resp. ¶ 66.) Jacobson discloses an earphone amplifier system for the hearing impaired.  (Pl. 56.1 Inv. Resp. ¶ 65; Def. 56.1 Inv. Reply ¶ 30.)  Jacobson discloses a switch that automatically turns on the amplifier in response to when the handset is removed from the cradle of the phone.  (*Id.*)

The Ellipse, an allegedly prior art product produced by GN Netcom A/S, is a digital wireless headset consisting of a base station that is connected to a corded desktop telephone and a remote unit

that can be connected to a corded headset for mobile use. (Pl. 56.1 Inv. Resp. ¶ 42.) The Ellipse uses DECT-based protocols to transmit audio signals. (*Id.*) The DECT standard was developed in the 1990s. (Pl. 56.1 Inv. Resp. ¶ 41.) The Ellipse product was released onto the public market in August 1999. (Pl. 56.1 Inv. Resp. ¶ 42.) The Ellipse does not have a conferencing capability, but a specification produced in 1999 indicated that a conferencing function could be added with one to two months' work. (Pl. 56.1 Inv. Resp. ¶¶ 43, 44.) However, conferencing was never implemented as a feature of the Ellipse product. (Pl. 56.1 Inv. Resp. ¶ 47.)

## IV. The Accused Products

Callpod asserts that certain products produced, distributed and sold by the Defendants directly and indirectly infringe claims 9, 10, 11, 12, 18, and 20 of the '611 patent. (Pl. 56.1 Non-Inf. Resp. ¶ 11.) The accused products are the GN9120, GN9125, and GN9350—wireless headset products consisting of a base station and a wireless headset. (Pl. 56.1 Non-Inf. Resp. ¶ 26.) The accused products allow users to make conference calls using up to four individual wireless headsets. (Def. 56.1 Non-Inf. Reply ¶ 8.) The products use DECT functionality for operation. (Pl. 56.1 Inv. Resp. ¶ 41.)

The accused products are packaged with a stand for the base station, a connection cord for connecting the base station to a wired phone, and an electrical power adapter. (*Id.*) The cord that connects the base station to the telephone jack is an RJ-9, which cannot connect to a cellular phone. (Pl. 56.1 Non-Inf. Resp. ¶ 58.) The accused products do not come with a cord to connect the base station to the headset. (Pl. 56.1 Non-Inf. Resp. ¶ 26.) The base stations of the products do not contain batteries, but draw power from an electrical outlet. (Pl. 56.1 Non-Inf. Resp. ¶ 29.)

Conversely, a figure in the '611 patent shows that the patented call pod is powered by a three volt battery. (Pl. 56.1 Non-Inf. Resp. ¶ 21.)

Power is supplied to the accused devices when they are plugged into electrical outlets. (Pl. 56.1 Non-Inf. Resp. ¶¶ 30–33, 35.) When there is not a call, users of the products can still use the products to have an intercom conference. (Pl. 56.1 Non-Inf. Resp. ¶ 37.) The accused products charge their headsets in a provided cradle as long as the base station is plugged in. (Pl. 56.1 Non-Inf. Resp. ¶ 38.) The products' user manuals instruct users to connect the base stations to a wired telephone jack. (Pl. 56.1 Non-Inf. Resp. ¶ 41.) Defendants market the accused products for use with wired phones or a personal computer. (Pl. 56.1 Non-Inf. Resp. ¶ 42.) The declaration of regulatory compliance packaged with the products implies that the products are not intended for use with wireless phones. (Pl. 56.1 Non-Inf. Resp. ¶ 46.) The accused products have a built-in amplifier and switching mechanism. (Pl. 56.1 Non-Inf. Resp. ¶ 66.)

The GN Netcom Smart Cord when used with the GN Netcom QD to 2.5 millimeter adapter, however, is available to users that allows a user to connect the accused products to cellular phones. (Pl. 56.1 Non-Inf. Resp. ¶ 43.) However, Defendants have never marketed the GN Netcom Smart Cord for use with the accused products or for use with cordless or cellular phones. (Pl. 56.1 Non-Inf. Resp. ¶ 71.)

Defendants first sold the GN9120 in the United States in about March 2003. (Pl. 56.1 Non-Inf. Resp. ¶ 27.) The GN9350 was first manufactured and sold in January 2006. (*Id.*) Callpod notified GN Netcom A/S of the '611 patent and Callpod's claim of infringement orally on July 14, 2006 and in writing on August 14, 2006. (Pl. 56.1 Non-Inf. Resp. ¶ 28.)

## DISCUSSION

20

# I.     Defendants' Motion for Summary Judgment of Invalidity of the Claims of the '611 Patent

A patent is presumed to be valid. *Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009). Clear and convincing evidence, sufficient to "place[] in the fact finder an abiding conviction that the truth of [the] factual contentions [is] highly probable," is necessary to invalidate a patent. *Id.* (internal quotation omitted); *see also Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1356 (Fed. Cir. 2008) (noting "the movant's burden to prove invalidity by clear and convincing evidence").

Section 103 of Title 35 of the U.S. Code prohibits the issuance of a patent if "'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103). Obviousness is a question of law based upon underlying facts. *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). An obviousness analysis is based upon four factual issues: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art at the time the invention was made, and (4) any objective evidence of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

Where the prior art teaches, suggest, or motivates a person having ordinary skill in the art to combine the references to create the invention and all its limitations then the invention is obvious. *See KSR*, 550 U.S. at 419. However, even in the absence of any teaching, suggestion, or motivation to combine, if there is a common sense reason why it would be obvious to try the combination then the invention is also obvious. *See id.* at 421. Where a reference or combination of references in the

prior art teaches away from a specific combination, then the claimed invention may not be obvious. *See Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1371, 1322 (Fed. Cir. 2004).

A.  **The Level of Ordinary Skill in the Art at the Time the Invention was Made**

The parties agree that the level of ordinary skill in the art at the time the invention at issue here was made is that of a person with a 2-year college degree in an engineering discipline with additional experience in an industry involving the use and operation of telephones.

B.  **Scope and Content of the Prior Art**

Prior art is considered analogous under the *Graham* factor analysis if it is within the same field of invention as the patent at issue or if it addresses a similar problem that the patent at issue is trying to solve.  *See In re Clay*, 966 F.2d 656, 658-59 (Fed. Cir. 1992).  "The teachings of prior art references are underlying factual questions in the obviousness inquiry."  *Kubin*, 561 F.3d at 1355.

Here, there are disputed issues of material fact with respect to the scope and content of the prior art.  The parties agree that Lucey, Diethorn, and Adachi are prior art to the '611 patent.  However, Callpod contends that Jacobson and Hall are not prior art because they do not relate to conferencing or conference devices.  Jacobson refers to an ear amplifier with an automatic switch to activate the ear amplifier when a handset is removed from its cradle.  Hall refers to an encryption add-on for a cellular phone that detects a microphone bias current to activate the encryption device when a call is placed or received.  Whether these two references are reasonably related to the problem to be solved or are within the same field of endeavor are issues of fact best left to a jury. *See State Contracting & Eng'g Corp. v. Condotte America, Inc.*, 346 F.3d 1057, 1069 (Fed. Cir. 2003) (whether prior art is analogous under the two criteria is a question of fact).

Moreover, the parties dispute the precise scope of what is disclosed by Adachi, Jacobson and Hall. Callpod contends that Adachi discloses only a direct connection to a telephone network and not to an intervening telephone. Defendants argue that Adachi teaches a conferencing device that may be connected to a variety of telephony networks. Thus, there is a disputed issue of material fact whether Adachi discloses or even suggests a "means for operably connecting a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod" as required by independent claim 9 of the '611 patent or "a wireless telephone interconnect cable adapted to operably connect a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod" as required by independent claim 18.

The parties also disagree over whether Jacobson discloses automatic activation of an accessory using microphone bias current. Callpod states that Jacobson only mentions DC bias voltage and does not specifically disclose the use of microphone bias current. The Defendants disagree and argue that DC bias voltage from the line to the microphone is precisely what microphone bias current is. Thus, there is a disputed issue of material fact as to whether Jacobson's DC bias voltage for automatic accessory activation is a disclosure of using microphone bias current for the same purpose.

Finally, Callpod and Defendants diverge on whether Hall's sense circuit senses a microphone bias current. Callpod's main contention is that the sense circuit merely senses microphone bias current from a microphone bias generation device. Defendants counter that the microphone bias sensor element senses microphone bias current generally and automatically powers on or off the circuitry of the accessory. Thus, there is a disputed issue of material fact concerning whether Hall's

microphone bias sensor element senses microphone bias current generally, or only that emanating from a microphone bias generation device.

As a result of these disputes concerning the scope and content of the prior art, there are disputed issues of material fact precluding summary judgment on the issue of obviousness of the claims of the '611 patent.

### C. The Differences Between the Prior Art and the Claims at Issue

Because there is a disputed issue of material fact over the scope and content of the prior art, it would be an act of futility to attempt to determine the differences between the prior art and the asserted claims. *See, e.g.*, *In re Dippin' Dots Patent Litigation*, 249 F. Supp. 2d 1346, 1361 (N.D. Ga. 2003) ("Because the scope and content of the prior art cannot be resolved, it is not possible to know what the differences are between the prior art and the patented invention"). The Court cannot therefore properly assess this factor, making summary judgment on obviousness improper.

### D. Objective Indicia of Non-Obviousness

Five objective indicia may indicate nonobviousness: (1) simultaneous invention, (2) a long-felt but unmet need, (3) laudatory statements, (4) copying of the patented invention, and (5) commercial success. *See Graham*, 383 U.S. at 17-18; *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1376-80 (Fed. Cir. 2000).

An invention may be inferred to be obvious if several inventors arrive at the same advancement simultaneously. *See Ecolochem*, 227 F.3d at 1379. The issue of simultaneous invention is directly tied to the knowledge of one skilled in the art. *See id.* The Defendants contend that GN Netcom A/S and RTX's joint development of the Ellipse in 1999 is evidence of independent invention. However, the Ellipse is not precisely identical or analogous to the claims of the '611

patent in all relevant aspects. Most significantly, the Ellipse as actually produced did not contain a conferencing feature, and Defendants' argument that such a feature could have been added with minimal effort does not prove that they independently invented the key advancement of the '611 patent.

With respect to the long-felt but unsolved need factor, Defendants contend that Callpod's failure to finalize a single license to the patent is evidence of the absence of a long-felt need. Callpod counters by arguing that the Defendants' marketing statements demonstrate that there was a long-felt need satisfied by the '611 patent. Both these arguments miss the point of this factor. Even taking Defendants' marketing statements regarding the value of their product at face value, Callpod has neither established that there was a long-felt need for a product in the market nor that others had attempted and failed to create a similar device. *See Adv. Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000) (failure of others to develop a solution to an identified problem is very probative evidence of nonobviousness). Likewise, Defendants' argument concerning licensing of the '611 patent does not indicate a specific absence of a long-felt but unmet need, as any number of unidentified and unknown factors could have prevented Callpod from licensing even a product for which there was a dire need in the relevant field. Thus, this factor favors neither party.

Additionally, laudatory statements about the invention by those working in the field may also indicate nonobviousness. *Vulcan Eng'g Co., Inc. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002). There is no evidence of industry praise in the record here; thus, this factor also favors neither party.

Copying of the invention is also evidence of nonobviousness, though not compellingly so. *Ecolochem*, 227 F.3d at 1380. For evidence of copying to be persuasive, a period of time needs to pass where the copyist attempted to independently create the invention and failed. *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984). Defendants argue—and Callpod does not contest—that they did not copy the '611 patent's claimed device, and there is no evidence that Defendants' own efforts to create a conferencing call pod were unsuccessful prior to the issuance of the patent.

Finally, commercial success is also persuasive evidence of nonobviousness. *Graham*, 383 U.S. at 17. However, the commercial success must have a nexus to the patentable features of the invention. *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). Commercial success due to features known in the prior art is not relevant. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006). Defendants contend that the lack of licensees for the '611 patent indicates a deficiency in commercial success. In opposition, Callpod argues that the commercial success of an infringing product can be sufficient to indicate the nonobviousness of the claimed invention. However, as will be discussed below, the accused products do not infringe the patent. Thus, any commercial success attributable to them does not factor into an obviousness analysis.

Because there are disputed issues of material fact over the scope and content of the prior art and the differences between the prior art and the claims of the patent, the Defendants' Motion for Summary Judgment on Invalidity of the Claims of the '611 Patent is denied.

**II.     Defendants' Motion for Summary Judgment of Non-Infringement of the Claims of the '611 Patent**

Section 271(a) of Title 35 of the U.S. Code states that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States . . . infringes the patent."  35 U.S.C. § 271(a) (2006).  Finding patent infringement requires a two-step process.  First, the court must construe the claims alleged to be infringed.  *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004).  Second, the court must compare the construed claims to the allegedly infringing device.  *Id.*

The accused device must meet every limitation of a claim—"either literally or under the doctrine of equivalents."  *Deering Precision Instruments, LLC v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003).  When an accused device lacks one or more of the claim limitations as sold to consumers, a defendant could be held liable, at the most, for inducing infringement.  *See Fina Research, S.A. v. Baroid, Ltd.*, 141 F.3d 1479, 1481-82 (Fed. Cir. 1998).  A device does not infringe simply because it may be altered to satisfy all the limitations of a claim.  *See High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555-56 (Fed. Cir. 1995).

Previously, this Court construed the relevant terms (1) "plurality"; (2) "call pod"; (3) "operably connecting"; (4) "means for operably connecting a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod"; (5) "wireless telephone"; (6) "interconnecting"; (7) "means for forming a two-way voice path among the plurality of headsets and the wireless telephone interface within the call pod"; and (8) "activates the call pod," "automatically activate," and "automatically deactivate."  (*See* R. 244, Mem. Op. & Order.)  All other terms in the claims did not receive construction and are thus left to their ordinary meaning.  As such, the claims asserted, with this Court's construction in bold following the construed language, read:

Claim 9:

An apparatus for providing a conference call connection among a plurality of conference call participants, such apparatus comprising:

a call pod **[a portable device which forms conference calls among a plurality of call participants]** for interconnecting **[connecting, which includes connecting physically, through the use of a cord, adaptor or wireless connection]** a plurality **[more than one]** of headsets of the plurality of participants;

means for operably connecting a headset interface of a wireless telephone **[a mobile phone or handset of a cordless phone]** with a wireless telephone audio interface of the call pod **[an interconnect cable with plugs]**; and

means for forming a two-way voice path among the plurality of headsets and the wireless telephone interface within the call pod **[the structure of a call pod]**, wherein the call pod includes a sense circuit structured to automatically activate the call pod **[powers on the call pod]** during a call and to automatically deactivate the call pod **[powers off the call pod]** upon termination of the call wherein the sense circuit detects a microphone bias current on a microphone input of the wireless telephone and activates the call pod using the detected microphone bias current.

Claim 10:

The apparatus for providing a conference call connection as in claim 9 further comprising means for activating the call pod upon detection of a call connection.

Claim 11:

The apparatus for providing a conference call connection as in claim 9 further comprising means for activating a flashing indicator upon detection of a call connection.

Claim 12:

The apparatus for providing a conference call connection as in claim 9 further comprising means for deactivating the call pod upon termination of a call connection.

Claim 18:

An apparatus for providing a conference call connection among a plurality of conference call participants, such apparatus comprising:

a call pod **[a portable device which forms conference calls among a plurality of call participants]** for interconnecting **[connecting, which includes connecting physically, through the use of a cord, adaptor or wireless connection]** a plurality **[more than one]** of headsets of the plurality of participants;

a wireless telephone interconnect cable adapted to operably connect **[connect in a manner that allows a signal to flow from one point to another point]** a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod; and

first and second circuits adapted to form a two-way voice path among the plurality of headsets and the wireless telephone interface within the call pod, wherein

the call pod includes a sense circuit structured to automatically activate the call pod **[powers on the call pod]** during a call and to automatically deactivate the call pod **[powers off the call pod]** upon termination of the call wherein the sense circuit detects a microphone bias current on a microphone input of the wireless telephone and activates the call pod using the detected microphone bias current.

Claim 20:
The apparatus for providing a conference call connection as in claim 18 further comprising a flashing indicator adapted to provide indication of a call connection.

In determining whether there is infringement, this Court will compare the claims, as construed, with the accused devices.

## A.     Literal Infringement

For the accused products to literally infringe the asserted claims of the '611 patent, the products must contain each and every element of claims 9 or 18.  *See Fina Research*, 141 F.3d at 1481-82.  If any of the limitations of these independent claims is lacking, then there is likewise no literal infringement of the subsequent dependent claims.  *Id.*  Thus, initially this Court will limit its analysis of literal infringement to claims 9 and 18 for summary judgment of non-infringement.

Defendants specifically point to four limitations that they contend do not exist in the accused products: (1) the accused devices do not have a wireless phone interconnect cable, (2) the accused devices are not portable, (3) the accused devices do not power on or off based upon a microphone bias current, and (4) the accused devices do not have a sense circuit.

### 1.     *Wireless Phone Interconnect Cable*

No reasonable juror could find that the accused products literally contain the limitation of having a wireless phone interconnect cable.  None of the accused products are sold with a wireless phone interconnect cable.  Callpod's argument that the accused devices when combined with separate products infringe the claims of the '611 patent at most potentially raises an issue of induced

infringement.  *See id.* at 1481-82 (holding that, because the accused product did not have one necessary element, the most defendant could be liable for was indirect infringement if customers created the combination product).  Moreover, the argument that the accused devices need only to have the capability to connect to a wireless phone is equally meritless.  The plain language of claims 9 and 18 require "means for operably connecting a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod" and "a wireless telephone interconnect cable adapted to operably connect a headset interface of a wireless telephone with a wireless telephone audio interface of the call pod," respectively.  Nowhere in this language is there the hint of merely requiring the capacity to connect to a wireless phone with an interconnect cable.  Thus, this limitation is not present literally for literal infringement of claims 9 or 18.

### 2.    *Call Pod*

A genuine issue of material fact exists as to whether the accused products are call pods.  This Court construed the term "call pod" to mean "a portable device which forms conference calls among a plurality of call participants."  The main disagreement between Defendants and Callpod is whether the accused products are "portable" or not.  While the Defendants cite the promotional material used by Callpod to promote its Phoenix product, this is not determinative of the meaning of "call pod" and portability.  A reasonable juror could find that the accused products, which are relatively small and light-weight, are portable using the ordinary meaning of the word (even though they can only be operated when plugged into an electrical socket).  Thus, a genuine issue of material fact exists as to whether the accused products are "call pods" as construed by this Court.

### 3. Automatically Activate the Call Pod During a Call and Automatically Deactivate the Call Pod Upon Termination of the Call

No reasonable juror could find that the accused products automatically activate during a call and automatically deactivate upon termination of the call. As this Court construed this limitation, to automatically activate or deactivate means to power on or power off, respectively. It is undisputed that when the accused products are plugged into the wall, they draw power and power on within the plain meaning of the word. Callpod's only response to this is their expert's conclusion that all electronics draw some power when plugged in; this, however, is not relevant to the Court's determination of infringement of the patent. *See Dynacore*, 363 F.3d at 1273 (an infringement analysis consists of comparing the properly construed claims against the accused devices). The only issue here is whether the accused devices power on during a call and power off upon termination of the call. Because the accused devices activate their lights, charge their headsets, and can make intercom conferences while not during a call, the accused devices are already "powered on" in the ordinary sense of the word. The converse is likewise true for powering off upon termination of a call; when a call ends, the accused devices do not power off in the ordinary sense of the term. Thus, this limitation is not present literally for literal infringement of claims 9 or 18.

### 4. Sense Circuit

A genuine issue of material fact exists as to whether the accused devices contain a sense circuit. The principal issue at dispute between the Defendants and Callpod is whether or not the microphone bias current sensed by the sense circuit in the claims requires a DC current. Since the term microphone bias current was not previously construed by this Court, the Court looks to the patent itself to determine if the term is defined in some way. It is apparent from the specification of the patent that the microphone bias current must contain some DC current component.

Specifically, the patent states "[t]he sense circuit 50 may operate by monitoring a microphone bias current on a microphone input #2 . . . the voltage providing the bias current could be either positive or negative, depending on the design of the wireless telephone 12." U.S. Patent No. 6,801,611 at 2:43–54. Because the microphone bias current is defined as being *either* positive *or* negative, it must at least contain some component of DC current. However, despite this resolution, there still exists a genuine issue of material fact whether the accused products contain a sense circuit that is responsive to the microphone bias current. Defendants have failed to specifically show how the accused devices lack this limitation. Thus, a reasonable juror could find that the accused products contain a sense circuit.

In sum, the accused devices do not literally infringe claims 9 and 18 of the '611 patent as they lack the limitations of a wireless phone interconnect cable, do not automatically activate during a call, and do not automatically deactivate upon termination of a call. Furthermore, as claims 10, 11, 12, and 20 depend upon claims 9 and 18, the accused devices also do not literally infringe those dependent claims. Thus, the Defendants are entitled at least to summary judgment on the claims of direct literal infringement.

### B.      Doctrine of Equivalents

A finding of equivalence is a determination of fact. *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 609 (1950). The process of determining equivalence is intended to determine whether "the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention[.]" *Warner-Jenkins Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). The function-way-result analysis, appropriate in cases involving mechanical devices, requires that the alleged equivalent must "perform[] substantially the same

function, in substantially the same way, to get substantially the same result, as the limitation at issue in the claim." *Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1016 (Fed. Cir. 1998).

One important limitation on the doctrine of equivalents potentially at issue here is the risk of "ensnarement." That is, even if equivalence is found, if the asserted scope of equivalency of what is literally claimed would encompass the prior art, there can be no infringement. *See Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 683 (Fed. Cir. 1990), *overruled in part on other grounds by Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83 (1993).

For there to be any direct infringement by the defendants, the limitations of the claims that are not literally found in the accused devices must be present equivalently. The missing limitations are a wireless phone interconnect cable and the ability of the accused devices to automatically activate and deactivate in response to the presence or termination of a call.

As an initial matter, Callpod has not contended that the accused devices contain an equivalent to the automatic activation and deactivation limitation required by the claims. This lack of one limitation, either literally or equivalently, as required by all the claims precludes any direct, equivalent infringement claim.

Addressing the second missing limitation, no reasonable juror could find the RJ9–RJ9 cord provided in the accused devices as an equivalent to a wireless phone interconnect cable. First, to equate a wired phone cable with a wireless phone interconnect cable would vitiate the limitation of wireless phone.[5] *See Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998) ("If a theory of equivalence would vitiate a claim limitation . . . then there can be no infringement under the doctrine of equivalents as a matter of law."). Throughout the specification of the '611 patent, the virtues of

---

[5] Indeed, if Callpod's contention of equivalency between a wireless phone interconnect cable and a wired phone cable, then it would only strengthen the argument that Adachi, as discussed previously, in combination with Hall or Jacobson invalidates the '611 patent on obviousness grounds.

using a wireless phone are discussed at great length. To now expand the scope of the claim through equivalency to recapture wired phones would not only render meaningless the term wireless phone—as used extensively throughout the patent and claims—it would also violate the ensnarement exception to equivalency. *See Wilson Sporting Goods*, 904 F.2d at 683. Callpod distinguishes Adachi in their invalidity argument specifically on the grounds that it is directly connected to the public switch telephone network. However, the patent discloses the conferencing device merely being connected to a circuit; it does not mention being directly connected to the telephone network without any intervening devices. Thus, no reasonable juror could find the RJ9–RJ9 cord to be equivalent to a wireless phone interconnect cable.

In summary, no reasonable juror could find that the accused products literally have the limitations of a wireless phone interconnect cable or that the accused products automatically activate during a call and deactivate upon termination of the call. Moreover, neither of these limitations is present in the accused devices equivalently. Defendants are thus entitled to summary judgment on Callpod's direct infringement claim in its entirety.

## C. Indirect Infringement

Indirect infringement is divided into two categories: (1) contributory infringement and (2) inducing infringement. *See* 35 U.S.C. §§ 271(b) & (c). To prove a claim for contributory infringement, the plaintiff must first establish an act of direct infringement and then show that the defendant knew that the combination of its components was patented. *See Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009). To prove a claim of inducing infringement, a plaintiff must show that the alleged infringer's actions induced infringing acts and that the alleged infringer knew or should have known his or her actions would induce actual infringements. *See id.*

No reasonable juror could find that the Defendants indirectly infringed the claims of the '611 patent on either theory. Callpod has failed to indicate any instances of customers directly infringing the claims of the patent by using the Smart Cord and 2.5 millimeter or 3 millimeter adapters in connection with the accused devices. Mere speculation of the possibility is insufficient. *See Warner-Lambert*, 316 F.3d at 1364 (mere knowledge of possible infringement by other persons does not amount to inducement to infringe a patent; specific intent and action to induce infringement must be proven). Moreover, the lack of the limitation of activating and deactivating the device in response to calls also precludes the necessary underlying finding of direct infringement necessary for a claim of indirect infringement.

Even assuming for the sake of argument that there was any underlying direct infringement by a user, Callpod's claim of indirect infringement must also fail, because no reasonable juror could find that Defendants had the intent required to maintain an indirect infringement claim. Even viewing the facts in a light most favorable to Callpod, there is no evidence indicating that the Defendants suggested the combination of the Smart Cord, the 2.5 or 3 millimeter adapter, and any of the accused devices. Thus, Defendants are entitled to summary judgment on Callpod's indirect infringement claim.[6]

### D.     Willful Infringement

Willful infringement requires that a patentee show, by clear and convincing evidence, that an infringer acted despite an objectively high likelihood that its actions infringed a valid patent. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). Specifically, a patentee must show

---

[6] It must be noted, as Defendants point out, that Callpod has not previously raised a claim of joint infringement, and cannot now force a trial solely on an allegation in a footnote its response brief to non-infringement. *See Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 664 (7th Cir. 1998) (plaintiff may not amend its complaint through arguments in its brief in opposition to a motion for summary judgment.)

that this objective risk was known to the defendant or was so obvious that it should have been known by the defendant. *Id.* The state of mind of the infringer is irrelevant. *Id.*

No reasonable juror could find that Defendants willfully infringed the '611 patent. Even viewing the facts alleged in a light most favorable to the plaintiff, Callpod has failed to show that there is a genuine issue of material fact barring summary judgment on willful infringement. Though Callpod notified Defendants of their alleged infringement on July 14, 2006, Callpod has not pointed to any evidence that there was an objectively high likelihood of infringement prior to that date, or that the risk was obvious or that Defendants knew of the risk. Defendants are thus entitled to summary judgment on the issue of willful infringement.

**CONCLUSION AND ORDER**

Defendants' Motion to Exclude Opinions of Callpod's Proposed Expert Witnesses is granted in part and denied in part as to the proposed testimony of Callpod's technical expert, Paul Bierbauer, and denied as to the opinion of Callpod's damages expert, James E. Malackowski. Callpod's Motion to Strike the August 7, 2009 Supplemental Expert Report of James L. Lansford is granted in part and denied in part. Callpod's Motion to Strike the Affidavit of Ilka Müller is denied.

Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, of Invalidity of the Claims of the '611 patent is denied. Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, of Non-Infringement of the Claims of the '611 patent is granted.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:   March 29, 2010